1

2

3

4

5

6                          IN THE UNITED STATES DISTRICT COURT

7

8                       FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10      KIMIKO KIMIO WILSON,

11              Petitioner,                              No. C 11-05207 WHA

12          v.

13      ANTHONY HEDGPETH,                                **ORDER DENYING
                                                         PETITION FOR WRIT OF**
14              Respondent.                              **HABEAS CORPUS**

15      _____/

16                                    **INTRODUCTION**

17          In this habeas action filed by a state prisoner, the petition is **DENIED**.

18                                    **STATEMENT**

19          Petitioner Kimiko Kimio Wilson is currently incarcerated at California State Prison,

20      Corcoran in Kings County, California.  Venue is proper as the events giving rise to his conviction

21      occurred in Contra Costa County.  28 U.S.C. 1391(b)(2).  Pursuant to 28 U.S.C. 2254, he has filed

22      a petition for writ of habeas corpus challenging a California state court conviction.  Petitioner is

23      represented by counsel.

24          In 2007, a jury in Contra Costa County Superior Court convicted petitioner of committing

25      two counts of first-degree murder and one count of attempted first-degree murder, with a multiple

26      murder special circumstance.  The trial court sentenced petitioner to life in prison without the

27      possibility of parole.  The California Court of Appeal affirmed the trial court's judgment in an

28      unpublished opinion.  The California Supreme Court denied review.

**United States District Court**
For the Northern District of California

In 2010, petitioner filed a petition for writ of habeas corpus in the Contra Costa County Superior Court. That court denied the petition in January 2011. Petitioner filed three petitions before the California Court of Appeal in February 2011. Those petitions were also denied. The state Supreme Court denied the petition in October 2011.

On October 25, 2011, petitioner filed the instant petition for habeas corpus. The following background facts are taken from the opinion of the California Court of Appeal:

> Kimiko Kimio Wilson was accused of shooting three people at close range as they sat in a car or attempted to escape, killing two and severely injuring the third.

> *          *          *

> On June 16, 2003, at about 8:39 p.m., DeForrest Thompson placed a 911 call to the police reporting a shooting at Triangle Court in Richmond, California. He reported that two people had been shot, one inside and one outside a black Chevrolet parked in the parking lot. He described a lone perpetrator as young, Black, and six feet tall. Thompson said that the perpetrator had fled the crime scene toward tracks that lead to North Richmond.

> Richmond Police Officer Michael Rood arrived at the crime scene at about 8:42 p.m. He observed a Black man later identified as Uchenna Okeigwe in the driver's seat of a black Chevrolet Caprice Classic with a gunshot wound to the head. The driver's door was closed and its window was partially open. An autopsy later disclosed that Okeigwe had two gunshot entry wounds to the left forehead, and a gunshot entry wound behind the left ear. There was gunpowder stippling near the head wound, which indicated the bullets were fired from between 6 and 18 inches away. The stippling covered an inch to an inch and one-half of area, which indicates it was in the closer end of the distance range. Okeigwe had $134.94 in currency and change loose in his pants pocket. No money or drugs were found in the Caprice, but small plastic Ziploc bags of the type often used to package drugs were hidden between the rear passenger-side seat back and the seat cushion. The keys to the Caprice were found on the floor of the car.

> A woman later identified as Erica Young was slumped over in the back seat of the vehicle with gunshot wounds to her back and head. The rear driver-side door was closed and its window was shattered. Autopsy reports later disclosed that a bullet entered Young's head below her left ear and jaw and exited her through her right chin. A second bullet entered her left lower back and exited the top read portion of her head. The trajectory was consistent with being shot by someone standing outside the left passenger window while she was stretched across the read seat of the car.

> A woman later identified as Sheianna Babcock was lying on the asphalt about 30 feet to the right (*i.e.*, passenger's side) of the vehicle, bleeding profusely from her head. The front passenger-side

2

door was open.  Babcock, who was still alive, was airlifted to John Muir Hospital in critical condition.

Eight bullet casings were found at the crime scene, three on the driver's side of the Caprice, three to the rear of the Caprice, and two near the place where Babcock was lying.  Forensic evidence established that all of the casings were fired from the same .45-caliber semiautomatic pistol.

### 1.     Initial Investigation.

Thompson testified that he saw the Caprice drive up slowly at about 8:30 p.m.  About 15 minutes later, while he was in his truck in the parking lot, he heard gunshots coming from the direction of the Caprice.  He looked in his rear and side-view mirrors and saw a young woman on the right side of the car, who was running and being chased by a man who had come from the front of the car.  No one else was in the area.  The woman slipped and fell.  The man stood over her as she lay on her back looking up at him with her hands extended outward, yelling something like, "I didn't do anything."  The man shot her, then ran northeast through a shortcut to North Richmond.

That night, Thompson described the suspect to the investigating officers as a Black male about 25 years old, six feet tall, 180 pounds. At trial, he similarly testified that the man was about six feet tall, skinny (about 180 pounds, not 230 pounds), and 20 to 25 years old, not 18 years old.  Because Thompson's truck was elevated, his estimate of the man's height might have been distorted.  Thompson testified that Wilson could have been the man he saw that night.

Later that night or early on June 17, 2003, detectives went to Okeigwe's residence and told Okeigwe's older brother, Emecca, that Okeigwe had been killed.  Emecca called Imoudu (Imo) Momoh, a friend of his and Okeigwe's, to share the news.  Momoh then came to Emecca's house and showed Emecca an incoming phone number from a call the previous night listed on his cell phone, which he thought might have been from Okeigwe.  Emecca recognized the originating number as [petitioner] Wilson's and told the investigating officers about the call.  They both knew Wilson as a friend and fellow student of Okeigwe at Diablo Valley College. Emecca told police the number belonged to "Kimiko," possibly "Kimiko Robertson" or "Roberts."  Emecca was certain about Kimiko's first name, but not about his last name.  Richmond Homicide Detective Mitchell Peixoto testified that Emecca told police that if Okeigwe went to Richmond, he was going to see "Kimiko Robinson."

### 2.     Sheianna Babcock.

On June 18, 2003, John Muir Medical Center notified Detective Peixoto that Babcock was able to communicate.  Babcock's head was screwed into a "halo," which immobilized her upper body.  She had two tubes down her throat and could not speak.  Peixoto asked her "yes or no" questions and had Babcock respond by blinking once for no and twice for yes.  Using this method, Babcock indicated that

she knew who had shot her and knew his name, that the shooter had been in the car with her before he started shooting, and that he was a Black male.  Babcock indicated the shooter's name was "Kimiko." She twice confirmed that "Kimiko" shot her.  Babcock also indicated that she knew where "Kimiko" lived, and that he lived in North Richmond.

Peixoto went to a police station and ran the names Kimiko Robinson and Kimiko Robertson on a computer database with no success.  He then ran the name "Kimiko" alone and the computer returned the name Kimiko Wilson.  The police obtained a picture of Wilson and determined "the description and location of where he lived . . . seemed to match."  Using a computer program, police put together a photographic lineup with persons who had similar characteristics, and Peixoto returned to John Muir on June 18, 2003, to interview Babcock again.  When shown the lineup, she identified Wilson as the shooter.  Peixoto had her confirm her answer twice.  He then showed her a single photograph of Wilson and she twice confirmed that he was the shooter.

Later the same day, Peixoto was informed that one of the tubes had been taken out of Babcock's mouth and that she could communicate on a limited basis.  When he arrived at her bedside, she appeared more alert, but also fearful.  He showed her the photographic lineup, but she did not focus on it and was looking away.  She said, "I don't know," and something like, "[They] all look the same."  Peixoto tried to "shock her back into reality" and asked her, "You're gonna let this guy get away with this?"  He told her, "You don't need to be scared of picking the wrong person because you actually know the person."  "You told me the name, and we spelled it out, and we talked about it.  And then I asked you a name, and you said yes." She again said that she did not know who had shot her.  Peixoto testified that when she was shown the single photograph of Wilson, she shifted to a fetal position and her heart rate climbed from 70 to 106.  Detective Peixoto believed that she was "in fear of her life and fear for some kind of retaliation."[1]

At trial, Babcock testified that she could not remember the John Muir interviews.  She remembered the day of the incident and some of what occurred at Triangle Court.  Earlier in the day, she was with Young, her first cousin, in Babcock's home in Concord.  Okeigwe called and asked Babcock to do his hair.  Babcock did beautician work in her home, and had done Okeigwe's hair before.  After she did his hair, Okeigwe asked Babcock and Young to ride with him to Richmond.  He said he was going to drive there and come right back, and they agreed.

Babcock and Young went to Richmond with Okeigwe in his black Chevrolet Caprice.  Okeigwe drove.  Babcock sat in the front passenger seat.  Young sat in the rear driver-side seat.  During the drive, Okeigwe was on the phone several times, and it appeared to Babcock that he was talking to the person he planned to meet.

---

1 At trial, Detective Peixoto stated that there was a heart-rate monitor in the hospital room.  Defense counsel did not object to Peixoto's testimony on Babcock's heart rate (RT, Exh. B at 1389).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

However, she had no memory of conversations in the car as they drove to Richmond, of Okeigwe stopping and picking someone up, or of where they went in Richmond.

At some point, Okeigwe's car was stopped in the area of other parked cars. Okeigwe, Babcock and Young were in the car. [Babcock] had no memory of a man being in the back seat of the car. She remembered hearing shots as she was getting out of the car. Then she remembered being on the ground and looking up at the person who shot her, who was standing right over her. She had no memory of how or why she fell. "I just remember laying on the ground, holding my hands up, looking at his face. And at one particular point . . . I cried out to God and asked him to have mercy on me because I wasn't ready yet." It was dusk and she got a clear look at the person's face and had a clear image of the person in her mind. It was Wilson. She had no doubt about her identification. Babcock remembered seeing the gun and thought it was a .45 because it looked like a police gun.

### 3. Wilson's Access to a Semiautomatic Pistol.

Daryl Jackson, a prosecution investigator, spoke to Ashley Jordan on June 25, 2004. Jordan said Wilson told her he sold marijuana and offered her free marijuana the day he met her. Shortly before June 16, Jordan was in North Richmond at a friend's house and saw Wilson remove a semiautomatic pistol from a car parked in the friend's driveway, place it in his waistband, and walk away. She said the pistol was about the same size as Jackson's duty weapon, which was approximately the same size as a .45-caliber pistol. Jordan testified at trial that she did not recall saying these things to Jackson.

### 4. Cell Phone Records.

On June 16, 2003, at 5:52 p.m., a call was placed from Wilson's cell phone to Okeigwe's cell phone. At 7:17 p.m., another call was made from Wilson's cell phone to Okeigwe's cell phone. At 7:19 p.m., a call was made from Babcock's landline phone to Wilson's cell phone.

At 8:02 p.m., a call was made from Okeigwe's cell phone to Wilson's cell phone. At the start of the call, Okeigwe's signal bounced off a cell tower in San Pablo and at the end it bounced off a cell tower in North Richmond. Between 8:06 p.m. and 8:09 p.m., five calls were made from Wilson's cell phone to an Alameda number that was identified in the phone records as a landline. The first four calls lasted one minute or less, and the fifth lasted four minutes. At 8:23 and 8:25 p.m., calls were made from Wilson's cell phone to Momoh's cell phone. Thompson's 911 call was made at 8:39 p.m.

The next call on Wilson's cell phone was a one-minute call placed at 8:57 p.m. to the same Alameda number that had been called five times between 8:02 and 8:09 p.m. Additional short calls were made from Wilson's cell phone at 8:59, 9:07, 9:10, 9:14, 9:16, 9:37 p.m.

1

2          5.      *Evidence of Drug Trafficking.*

3    Based on voice mail messages left on Okeigwe's cell phone, contact
     with a telephone number Okeigwe called on June 16, 2003, and
4    information provided by Emecca, Detective Peixoto, who was
     qualified as an expert on drug dealing in Richmond, opined that
5    Okeigwe was a street-level marijuana dealer, and that he was
     planning to purchase marijuana on June 16.

6
     Peixoto testified that persons involved in street-level sales typically
7    have suppliers from whom they purchase in large amounts. A
     street-level dealer might pay as much as $1,200 for one ounce, or
8    $7,000 for one pound, of high quality marijuana, such as marijuana
     grown in Humboldt County, California.

9
     Based on documents seized pursuant to search warrant from
10   Wilson's room in his grandmother's residence in North Richmond,
     Peixoto also opined that Wilson sold narcotics. He testified that
11   certain writings included a pay/owe sheet relating to drug
     transactions, and a list of monetary amounts in the thousands of
12   dollars.

13         6.      *Darlene Weaver.*

14   On June 19, 2003, at 2:56 a.m., a police SWAT (Special Weapons
     and Tactics) team executed a warrant to arrest Wilson at his last
15   known residence, a home in Antioch, California, but did not locate
     him. Peixoto spoke with the owner, Darlene Weaver, who was
16   Wilson's second cousin. The police told Weaver that Wilson was
     wanted for murder and she informed them that Wilson no longer
17   lived with her, but had moved to one of three residences in North
     Richmond. She gave him Wilson's cell phone number.

18
     Weaver testified that Wilson had lived with her and her family on
19   and off over the years, most recently from January to mid-April
     2003. He left because they had disputes about Wilson's complying
20   with household rules. Wilson was attending Diablo Valley College
     when he lived with them and she believed that Okeigwe was one of
21   Wilson's closer friends. He would frequently call for Wilson, they
     would go to clubs together, and he often gave Wilson a ride home.
22   After Wilson left the Weaver home, he went to live with his
     grandparents.

23
     Weaver described the police entry to her home as a frightening
24   experience. She testified at trial that she called Wilson at his
     grandmother's house at about 4:00 a.m. that morning. "I was very
25   scared, . . . yelling, crying, scared." She told Wilson the police were
     at her house and they broke down the door looking for him for
26   murder. "What did you do? . . . Why are they here?" He responded,
     "What? The police are at your house? What?" After about three or
27   four minutes, Wilson said he would call Weaver back. Weaver
     called back and Wilson's grandmother said Wilson just left.

28

Peixoto testified that Weaver told him that when she called Wilson that morning, Wilson did not respond immediately to her questions. Then he said, "'They don't have me as an accessory?'" She said, "No, they said you killed two people." Wilson then hung up the phone. Weaver immediately called back and Wilson's grandmother said he was no longer there.

### 7.    *Wilson's Arrest in Humboldt County.*

Peixoto discovered that Wilson had been calling numbers in Northern California before the murders. With this and other information, he put a house in McKinleyville in Humboldt County under surveillance. On July 9, 2003, Wilson got in the driver's seat of a car that had pulled up to the house and started to drive away. After about two blocks, two police SUV's behind Wilson activated their flashing lights to get him to pull over. Wilson drove evasively, accelerated to 45 to 50 miles per hour, at times reached 85 to 95 miles per hour, and ran stop signs. After about five minutes of pursuit, the transmission seal blew out on his car and it came to a rolling stop. Wilson was arrested.

### 8.    *Wilson's Defense.*

Wilson's defense at trial was based on third-party culpability. He testified that Marcus Rauls (deceased at the time of trial), was the actual perpetrator, and that the shootings were motivated by a drug-related dispute.

Wilson testified that he was raised in Richmond until he was about 16 years old. He lived on and off with Darlene Weaver in Antioch. He became acquainted with Okeigwe in January 2003 at Diablo Valley College, where both were students. Wilson and Okeigwe saw each other daily on campus, and frequently spoke by phone. Okeigwe was among Wilson's closest friends in June 2003.

Both Okeigwe and Wilson sold marijuana. They also provided each other with sources for marijuana, and sometimes sold marijuana to each other when they were short. One of Wilson's suppliers was Marcus Rauls. Rauls had just been released from juvenile custody for murder when Wilson met him. Rauls also sold marijuana to Okeigwe after Wilson introduced them. Both Wilson and Okeigwe would purchase about two or three ounces of marijuana at a time from Rauls, paying $250 to $300 per ounce, paying a total of about $750 in cash. Sometimes Okeigwe would contact Rauls directly, and sometimes he would ask Wilson to find Rauls for him in Richmond. Wilson was often present when Okeigwe bought marijuana from Rauls, which occurred once or more per week, and they often met Rauls for drug sales in Triangle Court, where the killings occurred. Wilson also called Rauls almost daily, and Rauls sometimes went to parties with Wilson and Okeigwe. Rauls also sold ecstasy and possibly crack cocain. Wilson did not sell those drugs, but he often saw Rauls sell ecstasy to Okeigwe when he was also selling him marijuana.

Wilson denied carrying a gun when he sold marijuana. He insisted that he did not have access to a gun, "but I'm sure in Richmond you

can find one." He denied that he ever removed a semiautomatic pistol from a car as allegedly described by Jordan. Wilson testified that he had seen Okeigwe with a gun, and that he had seen a gun on Rauls nearly every time he got in a car with him.

On June 16, 2003, Wilson and Okeigwe called each other in the afternoon. Okeigwe asked if Wilson could find Rauls for him. When Wilson saw Rauls later that day, he told Rauls that Okeigwe wanted to see him. Rauls said to meet him at 8:30 p.m. in Triangle Court. Wilson relayed that information to Okeigwe by phone and Okeigwe said he would come to Richmond with his cousin. Okeigwe later called Wilson to say that he was in North Richmond, and he picked up Wilson in his black Caprice. Instead of the cousin, two women were in the car whom Wilson did not know. Wilson sat in the rear passenger-side seat.

Okeigwe drove to Triangle Court and they waited in the car for Rauls. Wilson and Okeigwe were talking and music was playing in the car. Okeigwe used both Wilson's phone and his own phone while they were in the car. They were being friendly with each other, and there was no argument.

Wilson saw Rauls, who was Black, 5 feet 11 inches tall and 175 pounds, walking toward the car. Wilson opened the right passenger-side door. "As I'm getting out of the car, I heard gunshots, pops, booms." The sound was loud and it came from right behind him as he was exiting the car. His immediate reaction was to run. "[Y]ou don't stop to think . . . when you hear gunshots going off. You don't. You get away from 'em. . . . [G]rowing up in Richmond, I've been in areas where I've heard gunshots before, and as kids, we ran on." He ran southwest as fast as he could. As he ran, he heard more gunshots. When he reached Seventh Street, he saw someone from the neighborhood, who gave him a ride to his grandmother's house.

When Wilson arrived at his grandmother's house, he did not know whether anyone had been wounded or killed. He did not call Okeigwe because, "I mean, what do I call and ask? There was a shooting. I don't want to know. . . . [I]t's none of my business." About an hour later, he went outside and heard rumors that people were killed at Triangle Court.

Wilson went back to his regular routine selling marijuana in front of his grandmother's house. He learned two or three days later that it was Okeigwe who had been killed. Asked to explain how he felt, he testified, "You're confused. . . . You're trying to add what happened. You're trying to put things together. But it's like at the same time, now that I know some people were killed, I want to be completely removed." He did not go to the police because "I've never in my life called the police on anyone because just growing up in that area I've just saw adults, other kids, the way they react to people calling the police. You don't." "I don't want anything to do with this. That's just what's embedded in me, I guess you would say. . . . There's people in that town that see crime, felonies, every day. They don't call the police. That's my environment. That's not what you do." "I was in fear of the situation. Then, you know, you

United States District Court
For the Northern District of California

find out someone's dead. . . .  I don't care who was doing the shooting. . . .  [I]f one of 'em shot the other, do you not fear someone who's capable or willing to kill?"

When he received a call from Weaver at 4:00 a.m. on June 19, 2003, after the police had searched Weaver's house, "[T]he conversation was to the extent of:  Are you sure?. . . .  Are you 100 percent sure? . . . Okay, I know — I know something. . . .  Are they speaking . . . of a murder or is he wanted for questioning, accessory for murder?"  After the call, Wilson left his grandmother's home.  He did not recall where he went, but he returned to his grandmother's house later that same morning.

In the days following the shooting, Wilson had not seen Rauls as he normally would in the neighborhood.  He saw him after Wilson's name started appearing in the news as a suspect in connection with the shootings.  Rauls told Wilson that he needed to leave, and that Rauls had a place "up north" where Wilson could stay.  Wilson went to McKinleyville in Humboldt County, as Rauls directed, by bus.  He had been to parties in McKinleyville before and he knew the mother of Raul's child, Melissa, and some other people there.  He recalled being with Rauls in Humboldt County.

Wilson testified that Rauls told him why he killed Okeigwe while they were together in Humboldt County.  "He explained to me that . . . [Okeigwe] was snitching on him . . . to other drug dealers that you're selling drug[s] out of . . . territorial boundaries.  He's selling drugs in South Richmond, Central Richmond.  People find out about that, and he understood the seriousness of Okeigwe's alleged snitching."  "[I]t could have easily been reversed to [Raul's] death if he would have been caught over there in the area in which [Okeigwe] snitched . . . ."  He understood, but did not "accept," why Rauls would kill him over it.

Wilson testified that he called Rauls about once a month while he was incarcerated following his July 2003 arrest, and that he received letters from Rauls while he was in jail, but did not keep them.  Rauls sent his picture to Wilson soon after Wilson was arrested.

In April 2004, Wilson learned that Rauls had been shot to death.  When he heard the news, he "felt free" and he called his lawyer.  "I've already told them what happened, but it's like, hey, man, let the people know. . . .  [H]ey, can you call the [d]istrict [a]ttorney and tell them what happened? . . . I mean, shit, let the truth be known."

Regarding the several calls Wilson had made on his cell phone to an Alameda number both shortly before and shortly after the killings, Wilson said he did not remember who he called and speculated that he might have received someone's number and called it for the first time that night.  He testified that the calls had nothing to do with Okeigwe, Rauls, the killings, or the meeting at Triangle Court.  He could not say who he called at 8:57 p.m., shortly after the killings, attributing this to his state of mental confusion at the time.  Wilson testified that it could have been Rauls's number, even though Wilson had frequently called him before, because Rauls and many other drug dealers frequently changed cell phones.

Regarding the car chase that led to his arrest in Humboldt County, Wilson said he fled because he did not have a driver's license and he knew they would find out that he was wanted for murder.

Wilson acknowledged that he did not go to his friend Okeigwe's funeral or ever contact Okeigwe's or Young's relatives to express his condolences about their deaths.

The writing that Peixoto had opined was a pay/owe sheet for drug sales was not a pay/owe sheet, but a "piece of paper I was writing on numbers where I was trying to save up money to put together money to make a down payment on a motorcycle" in 2003.

Wilson acknowledged that in April 2004, shortly after Rauls was killed, he asked his mother to send him her phone records for May and June 2003, a period during which he was using her phone. He testified that he did so "[b]ecause they have all the numbers that I call on them. . . . You don't memorize calls. They have all my numbers on them, kind of like a phone book." He also admitted writing to his mother asking for the name of a woman who said she saw the killings, and telling her that she should send the information to him and not to his attorneys. Wilson's mother testified that Ethel Ingram, who lived in or near Triangle Court, had approached her in a grocery store parking lot and told her she was the shooter and it was not Wilson or any of his siblings.

Wilson further acknowledged that he attempted to contact potential witnesses, either directly or indirectly, in the weeks before trial. Wilson said that he tried in his own fashion to get Rauls's mother and ex-girlfriend to talk to his attorneys. He contacted Rauls's former girlfriend and mother on the assumption they might know something about the shootings based on their close relationship with Rauls. Rauls's mother would not help him because "she doesn't want no part because everything is interpreted as snitchin'. . . . Don't nobody want to talk to the police. Nobody want to talk to attorneys. Nobody want to talk to private investigators."

       *9.*     *Other Defense Evidence.*

The defense presented several witnesses to question the reliability of Babcock's identification. Mary Escobar, R.N., who was present during Peixoto's interviews of Babcock at John Muir, testified that Babcock was medicated with powerful sedatives, including prophyrol and morphine, at the time of the hospital interviews. She did not recall that Babcock had a noticeable physical reaction to being shown a picture of Wilson during the third interview, as Peixoto had testified. Nagui Achamallah, a psychiatrist at John Muir who evaluated Babcock for post-traumatic disorder, testified that she had an acute stress reaction, which when coupled with her physical trauma and psychological stressors could have impacted her memory. Dr. Scott Fraser, a psychologist and expert in the area of identification and memory, described factors that affect eyewitness identification, including weapon focus, fight-or-flight reactions, and photograph bias. He opined that a witness's degree of confidence in an identification is not an indication of its accuracy.

### 10. Rebuttal.

Peixoto was qualified as an expert witness in the areas of possession, possession for sale and sale of controlled substances including marijuana in the streets of Richmond. He testified that street-level drug dealers in Richmond fiercely and violently defend their selling territories, and that deaths commonly resulted from such territorial disputes. However, there was a "big difference" between street-level sellers and wholesalers. "Persons that sell in ounces and above, that deliver narcotics, there is no territory." They sell where the customers are. He also testified that the term "snitch" only applies to an individual who provides law enforcement with information, not one "drug dealer telling another drug dealer about what drug dealers are doing."

Peixoto testified that Wilson spoke to him about the crime after his arrest in Humboldt County. Wilson asked whether Peixoto thought he committed the murders. Peixoto said he did, and Wilson took a deep breath and said, "That's now [sic] how it went down." He said, "Fuck that. I'll tell you right now, I didn't pull no trigger." Some "bad shit" happened and he "r[an] for [his] life" but did not shoot "no one." Wilson told Peixoto that he was friends with Okeigwe but that Okeigwe had plans to rob someone in North Richmond, who happened to be a family member of Wilson's. Wilson said, "Even though we were friends, I had to tell my family member about these robbery plans." Peixoto asked for the name of the family member and said he would investigate to confirm the story, but Wilson refused to provide a name. He did not mention Rauls.

Peixoto asked Wilson to confirm that he told Weaver, "Are they looking for me as an accomplice?" and Wilson admitted making that statement. Wilson then said, "I don't know why I said that shit." Wilson said as soon as he spoke to Darlene Weaver, "he stopped the conversation and that day obtained a ride from a friend to McKinleyville." Finally, Wilson told Peixoto he had a bus ticket to leave for Atlanta, Georgia the next day and Peixoto was lucky he caught him when he did.

Christine Rauls, Marcus Rauls' mother, testified that she saw Rauls almost daily between June 2003 and when he was killed on August 4, 2004. Rauls never told her that he had anything to do with the killings. The trial "[wa]s the first I've ever heard that Marcus supposed to had done this, and he's been dead three years."

Wilson called Ms. Rauls from jail and said he was going to send someone to talk to her. Wilson's brother Marvin came to her house and asked her to take a drive with him. "[H]e said, 'You know, um, your son and my little brother was tight, and I don't even know how to come at you with this, but could you just help his little brother out and say Marcus did it?'" She did not respond and he told her just to think about it. Marvin asked her if she needed anything and she said she did not. He said if she did she should let him know and it would be taken care of. Then he dropped her off. The next day Wilson spoke to Ms. Rauls on the phone and said she should just think about it and he understood it would be hard for her to say that about her son and he understood because he had been friends with Rauls.

11

1   Ms. Rauls testified she thought Wilson and Rauls were friends.
2   Rauls supported himself by selling drugs and getting money from his
    girlfriends.  She had heard that he carried a gun, but she had never
3   seen him with one.

4            *11.      Prosecution Argument.*

5   In closing argument, the prosecutor relied almost entirely on the
    theory that Wilson was the direct perpetrator of the crime.  However,
6   he also briefly argued felony murder culpability based on aiding and
    abetting a robbery.

7   (Dkt. No. 12-1 at 1–17).

8                            **ANALYSIS**

9        **1.    STANDARD OF REVIEW.**

10       A district court may not grant a petition challenging a state conviction or sentence on the

11   basis of a claim that was reviewed on the merits in state court unless the state court's adjudication

12   of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable

13   application of, clearly established Federal law, as determined by the Supreme Court of the United

14   States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

15   light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong

16   of Section 2254(d) applies both to questions of law and to mixed questions of law and fact while

17   the second prong applies to decisions based on factual determinations.  *See Williams v. Taylor*,

18   529 U.S. 362 407–09 (2000); *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).

19       A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

20   clause of Section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

21   reached by [the Supreme] Court on a question of law or if the state court decides a case differently

22   than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at

23   412–13.  A state court decision is an "unreasonable application of" Supreme Court authority,

24   falling under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal

25   principle from the Supreme Court's decision but "unreasonably applies that principle to the facts

26   of the prisoner's case."  *Id*. at 413.  The federal court on habeas review may not issue the writ

27   "simply because that court concludes in its independent judgment that the relevant state court

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *See id.* at 409.

### 2.  ISSUES PRESENTED.

Petitioner asserts thirteen claims for federal habeas relief:

### A.  Sufficient Evidence Supported the Aiding and Abetting Theory.

Petitioner's first claim for relief is that insufficient evidence existed to convict him on the theory that he aided and abetted the murders (Petition 28, Traverse 13).

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light more favorable to the prosecution, *no rational trier of fact* could have found proof of guilt beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis added).  Under *Jackson*, the court must review the entire record when the sufficiency of the evidence is challenged on habeas.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors reached."  *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16.

Petitioner was found culpable of two counts of first-degree murder and one count of attempted first-degree murder, with a multiple murder special circumstance.  Petitioner argued in the California Court of Appeal that it was clear that one or more jurors relied on the prosecution's theory that petitioner was not the direct perpetrator of the shootings, but an aider and abettor, and that the theory was not supported by substantial evidence (Petition 28, Traverse 13).  The California Court of Appeal agreed that there was a reasonable probability that one or more jurors relied on the aiding and abetting theory, but found that there was sufficient evidence to support a conviction of aiding and abetting.  This order agrees.

United States District Court

For the Northern District of California

Under California law "a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." *People v. Beeman*, 35 Cal. 3d 547, 561 (1984). An aider and abettor must share in the principal's criminal purpose or intent. The prosecution must establish intent with respect to the specific offense that the defendant is alleged to have aided and abetted.

The evidence presented at trial was sufficient to support the theory that petitioner aided and abetted in the murders. Petitioner placed both himself and Rauls at the crime scene, and admitted that he was the one who directed Okeigwe to the location. While mere presence at the scene of a crime is alone insufficient to show aiding and abetting, it may be considered with other evidence in determining if that person is an aider and abettor. *See People v. Campbell*, 25 Cal. App. 4th 402, 409 (1994).

In addition to petitioner's presence at the scene of the crime, evidence was presented that Okeigwe had been robbed during the events in question. In final argument, Wilson's counsel agreed that the evidence showed that this was a murder during a drug transaction, the only issue being the identity of the shooter. Wilson testified that Okeigwe was there to conduct a drug transaction and that both he and Okeigwe typically purchased $750 worth of marijuana at a time. Only $134 was found on Okeigwe or in his car. The California Court of Appeal found that a jury could easily have inferred that whoever shot Okeigwe and his companions also stole the cash Okeigwe planned to use to buy the drugs. Jurors could have concluded that Wilson intentionally joined in the commission of a robbery, even if he did not intend to participate in murder. Under the felony-murder doctrine advanced by the prosecution, the jury could have found him liable for first-degree murder if they believed him to be an accomplice in this robbery (Dkt. No. 12-1 at 21–25).

The record also evinces motive. Petitioner testified that Rauls had a motive to kill Okeigwe for telling rival drug dealers that he had been selling drugs in their territory. In light of petitioner's apparently close relationship with Rauls on both a social and business level —

United States District Court

For the Northern District of California

petitioner admitted that Rauls was his supplier and his previous contacts with Rauls in Humboldt County suggest his involvement in Rauls's marijuana distribution operations might have been more extensive than he admitted — petitioner may have shared Rauls's interest in seeing Okeigwe dead. Alternatively, a motive for petitioner to kill or rob Okeigwe with another person could have been inferred from Peixoto's testimony that petitioner believed that Okeigwe planned to rob one of petitioner's relatives (RT, Exh. B at 2446).[2]

Petitioner also testified that the purpose of the meeting was to carry out a drug transaction and it could have been inferred that he chose a location where he believed this criminal conduct would not be readily detected. The evidence showed that petitioner called a number five times in rapid succession just before Okeigwe picked him up in Richmond en route to Triangle Court, a pattern that suggests he felt an urgency to contact the person associated with that number before he was picked up by Okeigwe. The first call he made following the murders was to the same number, a mere 20 minutes or so after the shootings. The jury may have found it less than credible that petitioner could not remember the identity of the first person he called after witnessing two cold-blooded murders ((Dkt. No. 12-1 at 22–23). Furthermore, the jury may have considered the calls as evidence that petitioner was attempting to set up the hit on Okeigwe.

Accordingly, there was evidence from which the jurors could readily have concluded that petitioner was fabricating all, or part, of his testimony. Petitioner did not publicly accuse Rauls until the start of trial, almost four years after the killings and three years after Rauls died. At about the time of Rauls's death in April 2004, petitioner asked his mother to send him her phone records from May and June 2003, even though he had been incarcerated since July 2003. Petitioner testified that he did so because he wanted to use the records as a sort of personal phone directory, but this explanation does not explain the timing of the request.

---

2 After petitioner was arrested in Humboldt County, he was transported to the Eureka Police Department for an interview and then to the Humboldt County Jail. During his ride to the jail, Detective Peixoto and petitioner had a conversation which Peixoto took notes on and later transferred the substance to his police report. Peixoto testified that petitioner first asked him whether he thought petitioner was guilty and later told Peixoto the story about Okeigwe planning to rob one of petitioner's family members. Peixoto described the conversation as not compulsory and defense counsel did not object to Peixoto's testimony. During cross-examination defense counsel did imply that Peixoto may have been shading the truth (RT, Exh. B at 2446).

15

**United States District Court**
For the Northern District of California

The California Court of Appeal was reasonable in finding that a jury could have concluded that petitioner's dealings after the killings with the person he identified as the perpetrator were not consistent with his testimony that he fled and refused to contact the police out of fear of Rauls, but rather as evidence that he and Rauls continued to cooperate in avoiding the police after the killing. He lived at Rauls' place in McKinleyville, and communicated regularly with Rauls once arrested and incarcerated.  Rauls's mother testified that she had the impression that petitioner and her son were friends and she testified that petitioner's brother told her that petitioner and Rauls were "tight."  In view of the lack of corroboration that petitioner feared Rauls, the jury could have inferred a consciousness of guilt from his repeated flight — from his grandmother's home after Weaver's call, from Richmond to McKinleyville, from the police during the car chase, and a planned departure from McKinleyville to Atlanta.  Detective Peixoto testified that petitioner changed his story about how he went from Richmond to McKinleyville (saying he took the bus during the interview in the police station, but saying he got a ride from a friend during the conversation in the police car), thus suggesting he was lying and losing track of his story (*id*. at 22–23).

Furthermore, petitioner's own statements to Weaver and Peixoto could reasonably be construed to confirm his role in the killings, at minimum as an accomplice.  One of his first reactions to Weaver's report that the police were looking for him was to ask if they wanted him *as an accessory*.  Petitioner implied in his testimony that by "accessory," a term he did not use in its technical legal sense, he meant witness, but the jury could have inferred that he made the comment because he was concerned that the police had determined that he was criminally involved in the killings.  Peixoto testified that when he asked petitioner if he had said, "Are they looking for me as an accomplice?"  The California Court of Appeal found that this statement "arguably disclos[es] [a] consciousness of guilt" (*id*. at 23).  Peixoto also testified that petitioner denied being the shooter, rather than denying that he was involved at all in the crime.  When Peixoto said he thought he was the shooter, petitioner said that was "no[t] how it went down," which arguably

United States District Court

For the Northern District of California

suggested he had greater knowledge about how the incident unfolded than he had claimed on the witness stand.[3]

The credibility of petitioner's testimony about his close friendship with Okeigwe may have been further undermined by his apparent failure to show emotion when he was asked on the witness stand how he felt when he learned Okeigwe was dead. The prosecutor referred to petitioner's demeanor in this specific context during cross-examination and closing statement, and defense counsel elicited testimony from petitioner about desensitization and revived the theme in closing. Petitioner admitted that he did not call Okeigwe or his family to express his condolences from the time of the killings to the time of trial. In stark contrast, he apparently maintained a friendly relationship with Rauls, someone he initially characterized as his marijuana supplier, but not really a friend. In closing argument, the prosecutor argued that based on the pattern of phone calls between petitioner and Okeigwe that there had been a falling out of some sort between the men in the month before the killings. On the day before the killings, petitioner repeatedly called Okeigwe. The prosecutor argued that this suggested an urgent need to contact him, possibly to carry out a preconceived plan to bring him to Triangle Court on the evening of June 16, 2003 (*id.* at 24).

Petitioner attempted to explain his behavior at and after the killings by asserting that he was desensitized by the violence in the community where he lived and was raised, and that certain rules of the street, such as the prohibition against snitching, were embedded in him. The California Court of Appeal rejected this argument finding that the jury was free to draw different inferences from that testimony. The harshness of petitioner's life, his involvement in drug dealing, and his access to weapons might have persuaded the jury that it was plausible that this 18-year old, who was not impeached with any adult criminal record, was nevertheless capable of cold-blooded murder for rather pedestrian goals, such as protecting the business operations of himself and his supplier, or to prevent the robbery of a relative (*id.* at 25).

---

3 This conversation was the same one that occurred during petitioner's transfer to the Humboldt County Jail. Counsel did not raise any objection to the testimony. Nor was it argued that petitioner was improperly Mirandized. Detective Peixoto took notes of the conversation that were later transferred to his police report (RT, Exh. B at 2446).

**United States District Court**
For the Northern District of California

Petitioner contends that there were reasonable innocent explanations for his conduct which support his defense.  The jury, however, had the opportunity to observe his demeanor on the witness stand and take those observations into account when it weighed the evidence.  By judging whether and when petitioner was telling the truth, in whole or in part, during his lengthy testimony, the jury could have been persuaded that the reasonable interpretations of certain circumstantial evidence were inculpatory, rather than exculpatory.  Some of petitioner's responses to cross-examination, for example, were substantive explanations of his actions, whereas others were categorical denials or implausible explanations.  The jury could reasonably have chosen to reject, for example, petitioner's testimony that he made none of the statements Peixoto attributed to him, and his testimony that he could not remember the identity of the first person he called a mere 20 minutes after he fled from the scene of the killings, and whom he had repeatedly called shortly before the murders.

In short, after carefully reviewing the entire record and drawing all reasonable inferences (including credibility determinations) in favor of the jury's verdict, this order holds that a rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  A rational jury could reasonably conclude from the evidence presented at trial that Wilson aided and abetted the double homicide.  Accordingly, petitioner's challenge to the sufficiency of the evidence of his conviction on a theory of aiding and abetting is **DENIED**.

**B.     Sufficiency of the Evidence of the Photo Identification.**

Petitioner's tenth claim for relief is that his identification in a photo lineup was not supported by sufficient evidence (Petition 51, Traverse 2–11).  Petitioner argues that the identification by victim Babcock "was based solely on confabulation, and tainted by improperly suggestive photo ID procedure" (Petition 51).  Petitioner argues that the photo lineup was improper because petitioner's head stood out because it was larger than the other heads and was the "only one that is tilted to one side" (*id*. at 52).  In addition, petitioner advances the theory that Babcock may have been suffering from confabulation, a condition in which gaps in one's own memory are implanted with information by others following a traumatic event.  *People v. Alcala*, 36 Cal. 3d 604, 620 (1984), *superseded by state statute*.

United States District Court

For the Northern District of California

Before trial, the trial court denied a motion to exclude Babcock's identification:

> THE COURT:  Well, the Court does agree that Mr. Wilson's head appears to be larger.  It appears to be a close-up or a little bit closer than the view of the other five pictures in the line-up.
>
> I note that he's in the number five position, Mr. Wilson.  And the gentleman in the number six position also had on a bright white T-shirt, as does the individual in photograph number one.
>
> However, the individual in number one has a — some sort of jacket over his white T-shirt because you can clearly see the white T-shirt.
>
> The gentleman in photograph three is titling his head as well.  The likeness that the Court's seeing, they all appear to be the same age; they all appear to have the same hair cut; they all appear to be the same skin tone and color, also appear all six of them have [a] slight mustache above the upper lip.
>
> So I think that in general the photographic line-up is not unduly suggestive, and therefore the motion is denied.

(RT, Exh. B at 334).

Furthermore, the jury's determination of Babcock's credibility was also reasonable. Whether Babcock's identification was accurate or a product of confabulation goes to the accuracy of her identification and is a matter for the jury.  Petitioner has the burden to show that the identification evidence violated due process because it "is so extremely unfair that its admission violates fundamental conceptions of justice."  *Dowling v. United States*, 493 U.S. 342, 252 (1990). "Due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."  *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012).

Here, the sequence of events do not point to a violation of due process nor objective unreasonableness by the jury.  On June 18, 2003, while Babcock was in the hospital following the shooting, she was visited by Detective Peixoto.  Babcock was intubated, and communicated by blinking (RT, Exh. B at 1296–99).  Detective Peixoto did not show Babcock any photos during this visit.  Rather, he asked Babcock whether she knew who had shot her.  She indicated yes (*id*. at 1305).  When Detective Peixoto inquired whether she knew the shooter's name, Babcock answered in the affirmative (*ibid*.).  When Peixoto asked whether the shooter had been in the car with Babcock and the two other victims before he started shooting, she again indicated yes (*id*. at 1306).  Detective Peixoto then asked whether the shooter was a male and an African

United States District Court

For the Northern District of California

1   American.  Babcock indicated yes to both (*id*. at 1307–08).  When asked, Babcock indicated that

2   she knew the name of the shooter and that it wasn't "Bone."  When asked if the shooter's name

3   was "Kimiko," Babcock indicated that it was (*id*. at 1312).  Babcock also indicated that the shooter

4   lived in North Richmond, and that she knew the street that the shooter lived on (*id*. at 1313, 1317).

5          The state court's conclusion that Babcock's identification of petitioner was admissible and

6   the jury's determination of Babcock's credibility was reasonable.  *See* 28 U.S.C. § 2254(d);

7   *Williams*, 529 U.S. at 409; *see also Coleman*, 132 S. Ct. at 2065 (reviewing court may not

8   substitute its judgment for that of the jury).  Petitioner's request for federal habeas relief on his

9   second claim of insufficiency of the evidence is **DENIED.**

10                      **C.      Fair Notice of the Aiding and Abetting Theory.**

11          In his third and eighth claims, petitioner contends that the grand jury indictment did not

12   give him adequate notice of the charges he faced (Petition 31, 40, Traverse 16–20).  The California

13   Court of Appeal rejected the claims as both procedurally barred, as well as meritless:

14          Wilson argues he was not given fair notice that the prosecution
            would be relying on an accomplice theory and the error was
15          prejudicial.  Wilson forfeited the argument by failing to object on
            this ground in the trial court and by failing to move to reopen his
16          case after the court agreed to give the instruction.  (*People v. Silva*
            (2001) 25 Cal.4th 345, 386 (*Silva*)) . . . .
17
            In any event, Wilson has not demonstrated error.  The Supreme
18          Court has "long held that a pleading charging murder adequately
            notifies a defendant of the possibility of conviction of first degree
19          murder on a felony-murder theory." (*People v. Gallego* (1990) 52
            Cal.3d 115, 188 [(*Gallego*)] . . . .) (*Silva, supra*, 25 Ca1.4th at p.
20          367).)  The court has acknowledged that, "[b]ecause of the different
            varieties of murder, . . . in some instances an information charging
21          murder without elaboration may not provide notice sufficient to
            afford the due process of law guaranteed by the Fourteenth
22          Amendment to the federal Constitution.  (*People v. Gallego*, supra,
            52 Cal.3d 115, 189 . . . .)" (*Silva*, at p. 368.)  In *Sheppard v. Rees*,
23          for example, the Ninth Circuit held the defendant was denied federal
            due process where the felony-murder theory was never directly or
24          indirectly raised during pretrial proceedings, opening statements,
            presentation of evidence, or counsels' discussion of jury instruction
25          with the court.  (*Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234,
            1235, discussed in *Gallego*, at p. 189.)  On the morning of closing
26          arguments, the court granted the prosecutor's eleventh-hour request
            for a felony murder instruction.  (*Sheppard*, at p. 1236.)  The
27          Attorney General conceded that the prosecutor had "ambushed" the
            defense, and the federal court granted the defendant habeas corpus
28          relief.  (*Id*. at pp. 1237–1238.).

                                             20

United States District Court

For the Northern District of California

In both *Silva* and *Gallego*, the court concluded there was no due process violation of the sort found in *Sheppard*. In *Silva*, where the defendant argued he was surprised by felony-murder instructions, the prosecutor had said in opening statements that the defendant intended to rob the victim, and had introduced evidence of attempted robbery. (*Silva*, supra, 25 Cal.4th at p. 368.) Together, these facts put the defendant on notice that the prosecutor intended to pursue a felony-murder theory. (*Ibid.*) In *Gallego*, the defendant similarly claimed surprise by a felony-murder theory; however, the defendant himself presented evidence that the murders were committed while he and another person were engaged in a robbery, and the prosecutor requested felony-murder instructions before the start of closing arguments, thus giving the defendant a fair opportunity to prepare his closing argument to address the theory. (*Gallego*, supra, 52 Cal.3d at p. 189.) The court found no error. (*Ibid.*).

Similarly, in this case, the prosecutor presented evidence of robbery during his case-in-chief: evidence that Wilson and Okeigwe went to Triangle Court to make a drug deal, that Okeigwe typically would pay more than $134 to purchase drugs in such a transaction, and that only $134 was found on Okeigwe and in his car following his murder. Defense counsel acknowledged early in the trial that the prosecutor's theory was that Wilson killed the victims in the context of "a drug rip-off or a money rip-off," and conceded in final argument that this killing arose from a drug transaction. Wilson presented evidence that a fifth person, Rauls, was at the scene, and the prosecutor elicited evidence that Wilson and Rauls were friendly and remained friendly after the murders. The prosecutor also presented evidence that Wilson called a particular number five times in rapid succession just before being picked up by Okeigwe, and dialed the number again shortly after the murders. The prosecutor presented evidence that Wilson asked Weaver, "They don't want me as an accessory?" and confirmed the statement to Peixoto. Also, the prosecutor presented evidence that Wilson made statements to Peixoto suggesting he was involved but not the direct perpetrator. This evidence should have put the defense on notice that the prosecutor was developing accomplice theories as an alternative to his primary direct perpetrator theory. In any event, the prosecutor requested the accomplice instructions well before the start of closing arguments and defense counsel had a fair opportunity to prepare to meet the argument.

We reject Wilson's argument that he was not given fair notice that the prosecutor would present an accomplice liability theory to the jury.

(Dkt. No. 12-1 at 26–28).

  The California Court of Appeal held that petitioner's claim is both procedurally barred, as well as lacking in merit.

United States District Court

For the Northern District of California

*(1)*      *The Claim is Procedurally Barred.*

"A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.  The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (internal citations omitted).  Here, the state court found that petitioner waived his claim "by failing to object on this ground in the trial court and by failing to move to reopen his case after the court agreed to give the instruction" (Ans. Exh. D at 26).  Federal courts have recognized that California's contemporaneous objection rule constitutes a valid procedural default in a variety of contexts similar to this one.  *See, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991) (failure to object to confession); *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011) (failure to object to evidence); *Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004) (failure to object to jury instruction); *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (failure to object on constitutional grounds to evidence).  Here, because the California Court of Appeal held that petitioner's claim was procedurally barred under state law, he must demonstrate cause and prejudice to obtain habeas relief under state law.  *Wainwright v. Sykes*, 433 U.S. 72, 90–91 (1977).  Petitioner has demonstrated neither.  He offers no explanation for his failure to raise this issue in a timely fashion.  Petitioner, therefore, has not established prejudice of a magnitude resulting in a fundamental "miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

In his traverse, petitioner argues that there is a state law exception to the contemporaneous objection rule "where an objection would be futile." *People v. Abbaszadeh*, 106 Cal. App. 4th 642, 648 (2003).  In *Abbaszadeh*, state court of appeal held that the contemporaneous objection rule did not apply for three reasons:  "(1) an objection would have been futile; (2) the People are at least equally at fault in allowing the error; and (3) we retain discretion to excuse the lack of an objection and elect to exercise that discretion in defendant's favor because of the shocking nature of the error which rendered the trial unfair." *Ibid*.  Here, none of these reasons existed. *First*, petitioner cannot show that an objection to the aiding and abetting instructions would have been futile because he never gave the trial court an opportunity to rule on it.  Nor does petitioner present

**United States District Court**
For the Northern District of California

1    a situation like the one in *Abbaszadeh* where the trial judge repeatedly shot down similar

2    objections. *Second*, the lack of objection by defense counsel is in no way the prosecution's fault.

3    *Third*, the state courts never exercised their discretion to waive the contemporaneous objection

4    rule. Accordingly, petitioner's objection is forfeit and procedurally barred from habeas review.

5

6                 *(2)      The Claim Lacks Merit.*

7        In addition to being procedurally barred, petitioner's claim lacks merit. Petitioner contends

8    that he was not given adequate notice that he would be prosecuted under an alternative theory of

9    aiding and abetting (Petition 31, 40). Petitioner cannot, however, point to clearly established

10    federal law, as determined by the Supreme Court of the United States, that establishes that his

11    constitutional rights were violated. 28 U.S.C. 2254(d)(1).

12        "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and

13    fairly informs a defendant of the charge against which he must defend, and, second, enables him to

14    plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v.*

15    *United States*, 418 U.S. 87, 117–18 (1974). "An indictment must provide the essential facts

16    necessary to apprise a defendant of the crime charged; it need not specify the theories or evidence

17    upon which the government will rely to prove those facts." *United States v. Cochrane*,

18    985 F.2d 1027, 1031 (9th Cir. 1993).

19        Here, the indictment provided:

20          The Grand Jury of the County of Contra Costa hereby accuses
          KIMIKO KIMIO WILSON, defendant, of the crime of felony, a
21          violation of PENAL CODE SECTION 187 (MURDER), committed
          as follows: On or about June 16, 2003, at Richmond, in Contra
22          Costa County, the defendant, KIMIKO KIMIO WILSON, did
          unlawfully and with malice aforethought murder Uchenna Noukwe
23          OKEIGWE, a human being.

24    (CT, Exh. A at 401). California Penal Code Section 971 provides:

25          The distinction between an accessory before the fact and a principal,
          and between principals in the first and second degree is abrogated;
26          and all persons concerned in the commission of a crime, who by the
          operation of other provisions of this code are principals therein, shall
27          hereafter be prosecuted, tried and punished as principals and no
          other facts need be alleged in any accusatory pleading against any
28          such person than are required in an accusatory leading against a
          principal.

United States District Court
For the Northern District of California

Our court of appeals has noted that the Supreme Court has clearly established a notice requirement for charges, yet has not clearly established a notice requirement for *theories of liability* for a given charge. *See Gautt v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007). Indeed, petitioner cannot point to a Supreme Court decision that creates a notice requirement for the theories of liability.

Petitioner does cite one decision of our court of appeals where habeas relief was granted based on a defendant's lack of notice of a felony-murder theory. *See Sheppard v. Rees*, 909 F.2d 1234 (9th Cir. 1989). Decisions of our court of appeals are not binding for the purposes of habeas review. 28 U.S.C. § 2254(d). Furthermore, *Sheppard* is distinguishable in that "the statements in *Sheppard* about the adequacy of the notice are dicta," since the State in that decision conceded that the defendant was denied adequate notice of the felony murder theory and the *Sheppard* court was not constrained by the Antiterrorism and Effective Death Penalty Act of 1996. *Murtishaw v. Woodford*, 225 F.3d 926, 939 n.4, 953–54 (9th Cir. 2001). Therefore, this order holds that petitioner's constitutional rights were not violated and that proper notice of the aiding and abetting theory was given. Petitioner's late-notice claim is, thus, **DENIED**.

### D.     Juror Unanimity.

Petitioner's second claim contends that he was denied his rights to due process and a fair trial when the trial court declined to give a unanimity instruction (Petition 30). This claim is without merit.

There is no constitutional requirement that "the jury reach agreement on the preliminary factual issues which underlie the verdict." *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990). Distinguishing between the facts necessary to satisfy the required elements of the charged offense from those facts that show the means by which the elements are established, the Supreme Court has held that juror unanimity is not required with respect to the theory underlying the criminal charge. "[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." *Schad v. Arizona*, 501 U.S. 624, 631–32 (1991).

24

United States District Court

For the Northern District of California

1    Because the California Court of Appeal applied the appropriate constitutional standards,

2    the denial of this claim was not an unreasonable application of clearly established Supreme Court

3    authority.

4        Petitioner cites *United States v. Ferris*, 719 F.2d 1405 (9th Cir. 1983), for the proposition

5    that "[i]n federal criminal prosecutions, *where a unanimous verdict is required*, the Courts of

6    Appeal are in general agreement that [u]nanimity . . . means more than a conclusory agreement

7    that the defendant has violated the statute in question; there is a requirement of substantial

8    agreement as to the principal factual elements underlying a specific offense." *Id.* at 1407 (internal

9    citations omitted) (emphasis added).  Our court of appeals has explicitly held, however, that a

10   specific unanimity instruction is not required to distinguish an aiding-and-abetting theory of

11   liability from the underlying substantive crime. *United States v. Garcia*, 400 F.3d 816, 820 (9th

12   Cir. 2005).  Thus, petitioner was not entitled to a unanimity instruction regarding which theory of

13   criminal liability triggered liability for the murders as a matter of federal due process.

14   Accordingly, this claim is **DENIED**.

15              **E.    Ineffective Assistance of Trial Counsel.**

16       In petitioner's fourth habeas claim, he argues that even though his trial counsel failed to

17   object to the lack of notice of the aiding and abetting theory, the failure to adequately preserve a

18   proper objection deprived petitioner of the effective assistance of counsel guaranteed by the Sixth

19   Amendment (Petition 32).

20       To prevail on a claim of ineffective assistance of counsel, petitioner must show both that

21   counsel's performance was deficient and that the deficient performance prejudiced petitioner's

22   defense. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  To prove deficient performance,

23   petitioner must demonstrate that counsel's representation fell below an objective standard of

24   reasonableness under prevailing professional norms. *Ibid*.  This requires showing that counsel

25   made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth

26   Amendment. *Id.* at 687–88.

27       The relevant inquiry is not what defense counsel could have done, but rather whether the

28   choices made by defense counsel were reasonable. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173

**United States District Court**
For the Northern District of California

(9th Cir. 1998). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001). The reasonableness of counsel's decisions must be measured against the prevailing legal norms at the time counsel represented the defendant. *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). A difference of opinion as to trial tactics does not constitute denial of effective assistance, *see United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

To prove counsel's performance was prejudicial, petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 688. The test for prejudice is not outcome-determinative, *i.e.*, defendant need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. *Id.* at 693.

The California Court of Appeal rejected this claim:

> [Petitioner] argues that trial counsel's failure to object or move to reopen his case amounted to ineffective assistance of counsel. However, when an ineffective assistance claim is raised on direct appeal, we will reverse the conviction only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his conduct. *(People v. Frye* (1998) 18 Cal.4th 894, 979–980, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn.22). Here, it is more than conceivable that defense counsel, a well-known and experienced criminal practitioner, made a tactical decision not to object to the instruction. In closing argument, defense counsel forcefully argued that the prosecution's adoption of a new theory of liability late in the trial demonstrated that even the prosecutor had a reasonable doubt about whether [petitioner] shot the victims. Moreover, defense counsel complained at sentencing about lack of notice of the accomplice theories. Because his statements at sentencing demonstrate he was aware of the argument, his failure to raise it earlier suggests a strategic choice. Similarly, we cannot conclude on this record that defense counsel lacked a rational tactical reason not to reopen

United States District Court

For the Northern District of California

1

2

3

4

> [petitioner]'s case to respond to the accomplice theories, even assuming the defense did not anticipate the theories. [Petitioner] does not describe what additional evidence he would have presented to respond to those theories. In sum, we cannot conclude on this record that the forfeiture of [petitioner]'s notice claim resulted from ineffective assistance of counsel and that [petitioner] is therefore entitled to relief from the forfeiture.

5 (Dkt. No. 12-1 at 26).

6       On the record, petitioner cannot demonstrate that the California Court of Appeal's denial of

7 his ineffective assistance of counsel claim was unreasonable. Petitioner argues that there can be

8 no tactical reason in allowing the prosecution to advance two theories of liability instead of one:

9

10

11

12

13

> The prosecutor, in closing, scoffed at the idea that Marcus Rauls was involved in this case as a fabrication on the part of [p]etitioner that came to light only after Rauls was dead and [p]etitioner realized that he could now safely use Rauls as a way to exculpate himself. To say that it was somehow in [p]etitioner's interest to allow the prosecutor to ridicule [p]etitioner's defense and then use it against him when defense counsel could have made a motion outside the presence of the jury based on a lack of fair notice offends common sense.

(Petition 32–33).

14       Petitioner's contention, however, overlooks the obvious tactical reason presented by the

15 California Court of Appeal:  that even the prosecutor had doubts about whether petitioner shot the

16 victims. It is not the role of the district court on habeas review to second guess trial counsel, but

17 rather to decide whether the choices made by trial counsel were reasonable. On the record it

18 appears that counsel made a tactical decision that was reasonable, despite the fact that it did not

19 pay off.

20       Nor does the record demonstrate that petitioner was prejudiced by his counsel's decision.

21 As the California Court of Appeal mentioned, petitioner does not describe what additional

22 evidence he would have submitted to rebut the aiding and abetting theory. Even if petitioner's

23 counsel was found to be ineffective, petitioner has not demonstrated that a different trial tactic by

24 counsel would have altered the result of the proceeding. Thus, petitioner's habeas claim for

25 ineffective assistance of counsel must be **DENIED**.

26           **F.      Ineffective Assistance of Appellate Counsel.**

27       In his thirteenth claim, petitioner argues that his appellate counsel was ineffective because

28 counsel failed to raise several meritorious claims on direct appeal (Petition 70). Specifically,

**United States District Court**
For the Northern District of California

1  petitioner argues that his appellate counsel should have raised the claims "[1] dealing with the

2  constitutionality of the prosecutor misleading the defense and [2] Sheianna Babcock's

3  misidentification of [p]etitioner" (*ibid*.).  Petitioner argues that his appellate counsel's conduct fell

4  below the level required by the Sixth Amendment to the United States Constitution.

5        Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

6  requested by the petitioner.  *See Jones v. Barnes*, 463 U.S. 745, 751–54 (1983).  The weeding out

7  of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *See*

8  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Appellate counsel therefore will frequently

9  remain above an objective standard of competence and have caused his client no prejudice for the

10  same reason — because he declined to raise a weak issue.  *Ibid*.

11        Petitioner raises two claims of ineffective assistance of appellate counsel.  *First*, petitioner

12  argues that his appellate counsel was ineffective for failing to raise a claim on direct appeal that

13  "the prosecutor misled[] the defense" and "ambush[ed]" petitioner with the aiding and abetting

14  theory (Petition 64, 70).  As discussed in Section J of this order, petitioner's claim that he was

15  misled is not meritorious and therefore, appellate counsel cannot have been ineffective for not

16  raising it.  Petitioner does not show how the adjudication of his claim was "contrary to . . . clearly

17  established Federal law, as determined by the Supreme Court of the United States."

18  28 U.S.C. 2254.  Petitioner has presented no evidence that his trial counsel or appellate counsel

19  perceived any prejudice in the prosecution raising the aiding and abetting theory.  Furthermore,

20  petitioner does not identify how he would have litigated the case differently had he known from

21  the outset that the prosecutor would alternatively argue liability based on aiding and abetting.  *The*

22  *aiding and abetting theory was a direct consequence of petitioner raising his own new theory on*

23  *the eve of trial*.  The fact that appellate counsel did not raise this claim on appeal indicates that he

24  believed the claim to be weak and perceived no prejudice in the prosecution's actions.  Because

25  there was no merit-worthy issue here for appellate counsel to raise, petitioner cannot show that

26  appellate counsel's performance was objectively unreasonable.  Finally, because the claim lacks

27  merit, petitioner cannot show that he was prejudiced by his counsel's decision.

28

United States District Court

For the Northern District of California

*Second*, petitioner argues that his appellate counsel was ineffective for failing to raise a claim regarding "Sheinna Babcock's misidentification of [p]etitioner" (Petition 70). Petitioner states that "[t]he most amateur and inexperienced criminal practitioner would have seen grounds to raise a claim on Sheinna Babcock's mis-identification of [p]etitioner, being that the entire case is largely based on Ms. Babcock's mis-identification of [p]etitioner" (*id*. 71). Again, petitioner has failed to identify a merit-worthy issue that appellate counsel failed to raise, nor does he demonstrate a reasonable probably that, but for appellate counsel's failure to raise the issue, petitioner would have prevailed on his appeal. Petitioner fails to state on what grounds his appellate counsel should have objected to Babcock's identification, but it is likely that he intends to raise the same issues as he did under his sufficiency of the evidence claim; that Ms. Babcock's identification suffered from "confabulation" and was "tainted by [an] improperly suggestive photo ID procedure" (Petition 51). For the reasons stated in Section B, petitioner has not identified a merit-worthy issue that appellate counsel was obliged to raise. Similarly, because this order has already rejected petitioner's misidentification arguments, petitioner cannot show that there was a reasonable probability he would have prevailed in his appeal. Accordingly, petitioner's ineffective assistance of appellate counsel arguments must be **DENIED**.

## G.    Trial Judge's Admittance of Evidence.

Petitioner's fifth claim is that his due process rights were violated when the trial court allowed in evidence that he had been asked to move out of Darlene and Ivan Weaver's home when he turned eighteen for irresponsible behavior and because he had a "ghetto mentality" (Petition 33).

The California Court of Appeal rejected this claim:

### A.    Factual Background.

In his opening statement, the prosecutor told the jury, "Now, you heard a little bit about the defendant and him being a poor [B]lack from Richmond. Well, that's not quite true. The fact of the matter is, starting at least in January of 2003, the defendant didn't live in Richmond at all. He lived in Antioch . . . with his second cousin, Darlene Weaver, and her husband Ivan. [¶] And they are not poor. They have a million-dollar house, or at least they just recently sold it for, like, [$]985,000 dollars. . . . [¶] . . . However, he apparently, for whatever reason, rejected the efforts of Ivan and Darlene to try to give him some opportunities. He conducted himself in a way that

29

United States District Court

For the Northern District of California

was of great consternation to them. They characterized it as kind of a ghetto mentality. [¶] And so, on his 18th birthday, which was April something, April 19th, 2003, on that very day Ivan put all of Kimiko's stuff on the doorstep and invited him to leave."

Midtrial, in anticipation of testimony by Darlene Weaver and her husband, defense counsel moved to exclude evidence of Wilson's conduct in the Weaver home and the "ghetto mentality" comment as inadmissible character evidence. The prosecutor argued that the evidence was relevant to explain the Weaver's relationship with [petitioner], illuminating why [petitioner] lived with the Weavers, why he left, and where he went after leaving their home. "[I]t's not my intention to spend a lot of time with background but to understand the context, and so the jury can know who Darlene Weaver is and why she's in the position to say the things she's able to say . . . ." The prosecutor argued the nature of their relationship was relevant to the jury's consideration of statements [petitioner] did (the accessory statement) and did not (protestations of innocence) make to Ms. Weaver after the killings.

The [trial] court ruled that testimony by the Weavers about their past relationship with defendant was "relevant to a certain degree because it does go to the witness[es'] motive and bias, and it does explain the relationship between them. It would explain why she would call him at 4:00 a.m., and it would explain why the police would come to her house, and it would further explain why he was not there. So, those things I do find highly relevant, and basically explains the situation of the spontaneous statement of what he's saying to her. [¶] So, for you, I think it actually cuts both ways. I don't find that the fact that he wouldn't do chores around the house is so prejudicial to outweigh the probative effect of the relevance of it that I do find is there, so I will allow the prosecutor to go in to explain the relationship that they have with the defendant."

Darlene Weaver testified that her relationship with [petitioner] was that of a parent and teenage son. They got along fine, but had some disputes about the times when [petitioner] would come home. The Weavers asked [petitioner] to call if he was not going to come home. Before [petitioner]'s 18th birthday, the Weavers told him he could stay as long as he wanted to if he followed household rules, such as calling if he was not going to be home at a certain time or doing household chores. He chose to leave and Ivan helped him move out.

Ms. Weaver denied that she told [Officer] Peixoto that [petitioner] continued to have a "ghetto mentality" and was not following the rules of the house. Peixoto, however, testified that Weaver told him she had taken [petitioner] into her home, but then had problems with him. She said [petitioner] had a "ghetto mentality" and Peixoto wrote "ghetto mentality" in quotation marks in his report, indicating that those were the exact words Weaver used.

(Dkt. No. 12-1 at 30–33).

District courts on habeas review do not review questions of state evidence law, but may only consider whether the petitioner's conviction violated a clearly established constitutional

United States District Court
For the Northern District of California

norm.  *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  Petitioner claims that he was denied his right to the fundamentally fair trial guaranteed by the due process clause.  Therefore, this order must consider whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair.  *See Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986), *cert. denied*, 479 U.S. 1068 (1987).  A mere violation of state evidentiary rules is not a sufficient basis for granting habeas relief.  *Jammal*, 926 F.2d at 919.

Admission of evidence that petitioner was asked to move out of Darlene and Ivan Weaver's home for bad behavior did not render the trial fundamentally unfair.  The California Court of Appeal found that evidence of petitioner's relationship to the Weavers was relevant in a number of regards:

> Evidence of Weaver's relationship with [petitioner] and their living relationship was relevant to explain why the police would seek to arrest [petitioner] at Weaver's house, why he was not there, why she would know where and how to locate him, why Weaver would call [petitioner] shortly after the search, and why [petitioner] would communicate with the Weavers while he was "on the run" and after his arrest and incarceration.  Evidence regarding the nature of their recent relationship was relevant to the jury's evaluating Weaver's testimony (specifically, discrepancies between her testimony and Peixoto's notes of her prior statements) and [petitioner]'s statements to her and to her husband.

> Nor did the admission of the "ghetto mentality" statement violate petitioner's right to a fair trial.  At trial, the defense placed great emphasis on petitioner's background as a poor Black man who grew up in the crime-infested area of North Richmond.  His counsel argued that [petitioner]'s conduct at the time of the shootings could only be understood in the context of an environment where snitching was not tolerated and people are so saturated by violence that they become desensitized and might seem callous to the outside observer.  Petitioner testified, "It's like a jihad every day I wake up."  That "ghetto mentality" statement tended to support the defense argument that [petitioner] was inculcated in the rules of the street, which required him not to report the killings and to flee on Rauls's instructions.  As the [trial] court stated when it admitted the evidence, "I think it actually cuts both ways."

> Finally, evidence of petitioner's expulsion from the Weaver's household was not unduly prejudicial.  As noted by the state court of appeal:  Weaver testified he would not do his chores, pay his share of some household costs, or comply with a curfew.  These are typical teenage tensions the jury was not likely to factor into its decision whether [petitioner] committed a double homicide.

(Dkt. No. 12-1 at 33).  This order agrees.

Petitioner has not met his burden in demonstrating that the evidence admitted against him so fatally infected the proceedings as to render them fundamentally unfair.  Petitioner's relationship with the Weavers was a peripheral issue in the trial and the evidence to which petitioner objects is relevant and not particularly prejudicial.  Accordingly, petitioner's evidence claim is **DENIED**.

### H.    Juror's Question.

In his sixth claim, petitioner argues that the trial court erred by declining to answer a juror's question about whether it was ethical for defense counsel to allow defendant to testify that he was innocent if defendant had confessed to his attorney (Petition 34).

The California Court of Appeal had the following to say on this claim:

> In its pretrial instructions to the sworn jury, the [trial] court stated, "If, during the trial, you have a question that you believe should be asked of a witness, you may write out the question and send it to me through the bailiff.  I will discuss the question with the attorneys and decide whether it may be asked.  [¶] Do not feel slighted or disappointed if your question is not asked.  Your question may not be asked for a variety of reasons, including the reason that the question may call for an answer that is inadmissible for legal reasons.  [¶] Also, do not guess the reason your question was not asked or speculate about what the answer might have been."

> During a break in [petitioner]'s redirect examination, the court conferred with the attorneys out of the presence of the jurors regarding two juror questions it had received.  One of the questions read, "Is it a breach of ethnics [sic] for defense counsel to place a defendant on the stand to testify on being innocent if the defendant has inferred the same defense counsel that defendant's committed a crime."  Defense counsel stated, "[U]nquestionably the answer is yes.  And I think the jury should be so informed."  The prosecutor objected, arguing it could not be a breach of ethics to do so because then a guilty person would not have the right to both speak truthfully to his attorney and testify on his own behalf.  He also argued that informing the jury that it would be a breach of ethics to allow a guilty defendant to testify he was innocent would "invit[e] the jury to speculate about matters within the purview of the attorney/client privilege," and would allow the jury to infer that Wilson had not confessed to his attorney, which was not in evidence, and was not subject to inquiry by the prosecution.

> The [trial] court stated, "This [c]ourt doesn't answer these notes.  They're just given to you."  When defense counsel offered to

32

United States District Court

For the Northern District of California

1

2

3

> have an ethics expert testify, the court ruled, "It's not relevant
> . . . . [¶] And it calls for speculation.  And it would get into
> something that could take a lot of time that this [c]ourt doesn't
> feel we should go into."

(Dkt. No. 12-1 at 34–35).

Petitioner claims that the trial court's refusal "to do anything in the face of the juror's question prejudicially jeopardized [his] right to a fair trial" (Petition 35).

Petitioner's claim fails, however, as it does not specify what it is that the trial court was constitutionally required to do in this situation nor does it identify "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. 2254(d)(1).

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  No evidence exists that petitioner was deprived of that right.  The juror's note did not evince bias on the part of the juror; nor did it suggest that the jury improperly discussed the case prior to its submission to them.  The question from an individual juror about defense counsel's ethical duty did not suggest juror misconduct.  The juror's inquiry was responsive to the court's invitation to submit questions, but the jurors were also told that submitted questions would not necessarily be answered, and that they should not speculate as to the reasons if they were not.  The question did not indicate that the juror was unwilling or unable to follow the court's instructions, or that any basis for discharge of the juror would have been revealed if the inquiry suggested had taken place.  Accordingly, petitioner's due process rights were not violated and this claim must be **DENIED**.

## I.      Prosecutorial Vindictiveness.

Petitioner's seventh claim is that his due process rights were violated because he was prosecuted solely for exercising his right to remain silent "during the time of arrest and in doing so contravened informing the State of Marcus Rauls' guilt as the sole perpetrator of this crime" (Petition 36).  "The fact that [p]etitioner exercised the right to remain silent, on the premise of the Code of Silence, and forced the Government to prove its case should not have warranted the prosecutor's retaliatory and vindictive actions toward [p]etitioner's advocacy of the 'Thou shall

33

not snitch' Code of Silence" (*ibid.*).  According to petitioner, the prosecuting attorney ignored exculpatory evidence — such as the testimony of witnesses Deforrest Thompson and Jesus Ponce, who gave a description matching Marcus Rauls as the shooter — as well as the "late-added theory" that petitioner aided and abetted the shooting (*id.* at 36–37).[4]

"To establish a prima facie case of prosecutorial vindictiveness, a defendant must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such." *United States v. Montoya*, 45 F.3d 1286, 1299 (9th Cir. 1995).  The burden then shifts to the prosecution to show that "independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its decisions." *Ibid.* (internal citations omitted).  "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Here, petitioner has failed to present any direct evidence of vindictive prosecution nor facts that warrant an appearance of such.  Ample evidence exists in the records that both the prosecution and the jury's conviction were based on petitioner's guilt, rather than vindictiveness.  Petitioner's claim that his prosecution was a result of his choice not to identify Marcus Rauls as the real killer is not persuasive, particularly considering the fact that petitioner did eventually implicate Marcus Rauls on the eve of trial.

Petitioner claims, in the alternative, that the "exculpatory evidence in support of [his] innocence is so strong" that the prosecutor's "continual pursuit of [his] conviction, in itself was an action of retaliation" for petitioner's exercising his right to remain silent (Petition 38).  Again, petitioner's contention is meritless.  Petitioner does not specify the "overwhelming" evidence of his innocence, but a review of the record finds little merit to this contention.  The jury had ample support for unanimously finding petitioner guilty.  At a minimum, the state court acted reasonably in concluding that petitioner had not established a prima facie claim of vindictive prosecution.

---

4  DeForrest Thompson was sitting in his truck when the shooting occurred.  He witnessed it through his rearview mirror, but testified that he never saw the shooter's face.  Thompson testified that he did not think petitioner was the shooter (RT, Exh. B at 1230–40).

34

United States District Court

For the Northern District of California

1   Accordingly, petitioner's due process rights were not violated and this claim for vindictive

2   prosecution must be **DENIED**.

3

4   　　　　　**J.**　　　**Adequate Notice of Aiding and Abetting in Jury Instructions.**

5   　　　　Petitioner's ninth claim contends that the prosecutor committed misconduct by

6   "deliberate[ly] misleading" petitioner and eventually "ambushing" him with the aiding and

7   abetting theory.  Petitioner states:

8   　　　　　　　Underscored by the previous two arguments, another way in which
    　　　　　　　the prosecutor unconstitutionally . . . deprived [p]etitioner of a
9   　　　　　　　meaningful opportunity to address the issues, was simply be
    　　　　　　　misinforming him.  Defense counsel was clearly prepared to meet
10  　　　　　　　the direct liability first-degree murder allegations, as that is what
    　　　　　　　they were informed that they needed to meet.  The record affirms
11  　　　　　　　that [p]etitioner's attorneys were undeniably caught short by the
    　　　　　　　prosecutor's startling announcement, after both sides had rested and
12  　　　　　　　immediately prior to closing arguments that he would in effect be
    　　　　　　　asking for, and receiving, aiding and abetting jury instructions.
13
    (Petition 46).
14
15  　　　　Where a petitioner on federal habeas corpus review alleges prosecutorial misconduct, the

16  issue to be decided is whether the conduct "so infected the trial with unfairness as to make the

17  resulting conviction a denial of due process"  *Darden v. Wainright*, 477 U.S. 168, 181 (1986)

18  (internal citations omitted).

19  　　　　Petitioner fails to identify any Supreme Court precedent finding misconduct under

20  circumstances even remotely similar to those here.  Instead, petitioner states that "the misleading

21  in the present case is very much akin to that in *Mooney v. Holohan*," 294 U.S. 103 (1935).

22  　　　　In *Mooney*, petitioner challenged his confinement by the state where the "sole basis for his

23  conviction was perjured testimony, which was knowingly used by the prosecuting authorities in

24  order to obtain [a] conviction, and that authorities deliberately suppressed evidence which would

25  have impeached and refuted the testimony thus given against him."  *Id*. at 110.  The *Mooney*

26  decision, however, is not on point.

27  　　　　Here, petitioner does not allege that the prosecutor withheld evidence, inappropriately

28  examined a witness, made inappropriate comments or argument to the jury, or otherwise violated a

    court order or instruction.  Instead, the sole contention is that the prosecutor requested an aiding

United States District Court

For the Northern District of California

1  and abetting jury instruction in response to petitioner's story that he knew the real shooter, which

2  was first revealed to the prosecution at trial.  The Supreme Court has never suggested that habeas

3  relief could lie under such circumstances.  28 U.S.C. 2254(d)(1).

4      As for petitioner's argument that he was "ambush[ed]," it too lacks merit.  Petitioner

5  admits that he was represented by "a well-known and experienced criminal practitioner"

6  (Petition 41).  Such a practitioner would likely have been aware that when petitioner changed his

7  story to include Marcus Rauls on the eve of trial, petitioner of course could be held liable as either

8  an aider and abettor or the direct perpetrator.  Indeed, defense counsel did not object to the

9  inclusion of the jury instruction, and in fact used its inclusion to argue that the prosecution was

10  unsure of its own case.  Such an argument indicates that defense counsel perceived no prejudice to

11  his defense.

12      Furthermore, as the California Court of Appeal recognized, petitioner has never explained

13  how he would have litigated the case differently had he known from the outset that the prosecutor

14  would alternatively argue liability based on aiding and abetting.  Accordingly, it was reasonable

15  for the state court to conclude that the prosecutor did not commit misconduct by requesting an

16  aiding and abetting instruction in response to petitioner's testimony.  Petitioner's claim is **DENIED**.

17          **K.   Judicial Bias.**

18      In his eleventh claim, petitioner argues that the trial judge, Mary Ann O'Malley, should

19  have recused herself due to the political and personal ties she shared with the Contra Costa County

20  prosecutor, Harold Jewett (Petition 61).  Petitioner claims that Jewett physically assaulted his own

21  supervisor, Paul Sequiera, for reasons related to Paul Sequiera's opposition to Judge O'Malley's

22  husband's candidacy for District Attorney of Contra Costa County in 2010.  Further, petitioner

23  cryptically states that "[t]here is a very strong inference that Judge Mary Ann O'Malley's findings

24  in [p]etitioner's trial were motivated by her and her husband's friendship with and political ties

25  with Harold Jewett . . . The assurance of Kimikio Kimio Wilson's conviction was used as barter by

26  Judge Mary Ann O'Malley to gain the political alliance of prosecuting attorney Harold Jewett"

27  (Petition 61–62).

28

United States District Court

For the Northern District of California

1    The due process clause entitles petitioner the right to a fair and impartial judge. *In re*

2 *Murchison*, 349 U.S. 133, 136 (1955). To overturn a conviction based on judicial bias, a petitioner

3 must "overcome a presumption of honesty and integrity" on the part of the judge. *Withrow v.*

4 *Larkin*, 421 U.S. 35, 47 (1975). The Supreme Court has found three circumstances where an

5 appearance of bias necessitates recusal. *First*, where the judge has a direct financial interest in the

6 outcome. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822–24 (1986). *Second*, where the judge is

7 faced with substantial direct personal insults from a litigant. *Mayberry v. Pennsylvania*,

8 400 U.S. 455, 466 (1971). *Third*, where the judge acted as part of the prosecution. *In re*

9 *Murchison*, 349 U.S. at 134–36.

10    The prosecution in its response to the habeas petition argues that there is no indication of

11 judicial bias and that "[i]t was Paul Sequeria, not [Harold] Jewett, who support [Judge O'Malley's

12 husband]" in the election (Ans. 49). If true, petitioner's claim would be nonsensical. Regardless,

13 petitioner has failed to present a prima facie case of judicial bias; his claim therefore, is **DENIED**.

**L.    Grand Jury Bias.**

15    Petitioner's twelfth claim for relief alleges that the grand jury panel contained a biased

16 juror. The juror in question "was an employee of the Richmond Police Department . . . [and]

17 personally knew Det[ective] Piexoto, the lead investigator of the crime and key police witness, and

18 likely knew other police witnesses as well" (Petition 65).

19    Before the grand jury proceedings commenced, the following exchange occurred between

20 the prosecutor and the grand jury member:

> [PROSECUTOR] MR. O'CONNER: Okay. In other words, you'll be able to treat the officers as you would treat any witness in trying to weigh their credibility?
>
> GRAND JUR[OR] DeLUZ: Yeah.
>
> MR. O'CONNOR: Okay. Would the — any of the officers start out ahead in your mind?
>
> GRAND JUROR DeLUZ: No.
>
> MR. O'CONNOR: Just because they're officers?
>
> GRAND JUROR DeLUZ: (Shakes head negatively.)
>
> MR. O'CONNOR: I'm sorry?

1      GRAND JUROR DeLUZ:  No, they wouldn't.

2      MR. O'CONNOR:  Okay.  And I guess the reverse should be asked.
       Are there any of the officers going to start out behind when they
3      come to testify because you may know them?

4      GRAND JUROR DeLUZ:  I don't think so.

5      MR. O'CONNOR:  Okay.  I guess — and the final question would
       be:  Do you believe you can be fair and impartial when weighing the
6      evidence in this case?

7      GRAND JUROR DeLUZ:  Yes.

8  (CT, Exh. A at 27–28).

9          Based on the above exchange, petitioner claims that grand juror DeLuz had an implied bias

10  against him.  The claim for implied bias, however, is not meritorious.  As our court of appeals has

11  recognized, "the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied

12  bias." *Fields v. Brown*, 503 F.3d 755, 768 (9th Cir. 2007) (en banc).

13         Similarly, "the Supreme Court has never held that a juror was impliedly biased in the

14  absence of juror dishonesty." *Id*. at 771.  Here, plaintiff does not allege that DeLuz was dishonest,

15  but merely that her job made her unqualified to serve on his grand jury.  Petitioner cannot point to

16  any "clearly established Federal law, as determined by the Supreme Court of the United States"

17  that stands for this proposition.  28 U.S.C. 2254(d)(1).  Therefore, his claim is **DENIED**.

18         Although not controlling on habeas review, our court of appeals has acknowledged that

19  bias may be implied when the juror's situation presents a relationship in which the "potential for

20  substantial emotional involvement, adversely affecting impartiality," is inherent.  *Tinsley v. Borg*,

21  895 F.2d 520, 527 (9th Cir. 1990), or as the Fourth Circuit has put it, "those extreme situations

22  where the relationship between a prospective juror and some aspect of the litigation is such that it

23  is highly unlikely that the average person could remain impartial in his deliberations under the

24  circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988).  Here, petitioner has not

25  presented an "extreme situation" in which the average person could not remain impartial.  At a

26  minimum, the state court was reasonable in concluding that there was that there was no implied

27  bias.  Thus, petitioner's claim of grand jury bias is **DENIED**.

28

*United States District Court*
For the Northern District of California

38

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

**CONCLUSION**

The petition for a writ of habeas corpus is **DENIED**.  Judgment will be entered in favor of respondent and against petitioner.  A certificate of appealability will not be issued.  Reasonable jurists would not find "the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  **THE CLERK SHALL CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated:  July 23, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE